# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Jeffrey Sorensen, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No: 12 C 50417 |
| | ) | |
| WD-40 Company, | ) | |
| *Defendant*. | ) | Judge Frederick J. Kapala |

## ORDER

Defendant's motion for summary judgment [67] is granted. Defendant's motion to strike [108] is moot. This case is closed.

## STATEMENT

Plaintiff, Jeffrey Sorensen, filed this suit against defendant, WD-40 Company ("WD-40"), for trademark infringement and false designation of origin under the Lanham Act, 15 U.S.C. § 1051 et seq. (Counts I and II); trademark infringement and unfair competition under Illinois common law (Count III); and for violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, et seq. (Count IV). WD-40 has moved for summary judgment. For the reasons that follow, the motion is granted.

## I. FACTS

The following facts are taken from the pleadings, the parties' statements of undisputed facts, the responses and replies thereto, and the evidence submitted in support. Plaintiff founded Van Patten Industries, which existed from 1997 to 2010, and is the founder and current Chief Executive Officer of Inhibitor Technology Corporation. Plaintiff only sells products that inhibit rust and contain Volatile Corrosion Inhibitor ("VCI").[1] VCI is a type of corrosion inhibitor used to protect ferrous materials against rust and corrosion by creating a chemical barrier that repels moisture and water. VCI technology has been in existence since the 1940s.

There are three trademarks, registered and unregistered, that plaintiff contends WD-40 has infringed upon. First, plaintiff is the owner of the word mark "THE INHIBITOR" which was registered on the United States Patent and Trademark Office's Principle Register on August 6, 2002 (U.S. Trademark Registration No. 2,604,283) (hereinafter "plaintiff's word mark" or "THE INHIBITOR word mark"). Second, plaintiff has used the orange "crosshair design mark" pictured below since 1997 to brand his line of rust prevention products and to differentiate them from other rust prevention products:

---

[1]At various places throughout the record this chemical is referred to as both volatile corrosion inhibitor and vapor corrosion inhibitor. Because this is apparently the same substance, the court will refer to either as VCI.

Third, in addition to using the crosshair design mark by itself, plaintiff has incorporated it into his word mark to form the "inhibitor design mark" pictured below which he has used to develop, market, promote, and sell his rust prevention products since 1997.



Plaintiff promotes and sells various products under THE INHIBITOR word mark and crosshair designs including VCI Plugs, VCI Pro Chips, V80 Nano-VCI Oil Blend, V80 VCI oil wipes, V80 VCI Grease, VCI Cleaner/Degreaser, VCI Covers, Poly Bags, Stretch Film, VCI Paper, and Wiping Cloths. Some product samples are pictured below.



There are multiple products on the market containing VCI and displaying the word "inhibitor" that are not manufactured or sold by either party to this case.

Plaintiff promotes his products by advertising at or sponsoring national events for prominent firearm, hunting, and fishing organizations including the National Rifle Association, the North American Hunting Club and the North American Fishing Club, among others. Between 1997 and 2008, plaintiff's products have been promoted in many hunting and fishing print and online media.[2] In 2008, plaintiff stopped advertising in print media and now uses Facebook as his primary method of advertising his products, but also promotes his products at trade shows and by word of mouth.

---

[2]The parties agree that these include: Texas Fish and Game; Plano Outdoor Products; Fishing Facts; Hunting the Country (vulcanpub.com); American Guardian; Cabela's (cabelas.com); Shooting Illustrated; Canadian Home Workshop; Adventure Sports Outdoors; Guns (gunsmagazine.com); Gun Trade News; Angler's Choice; Rifle Sporting Firearms Journal; North American Fisherman; Hunter's Handbook; Outdoor Life; Handloader-Ammunition Loading Journal; Guns and Weapons for Law Enforcement; Outdoor Canada; Texas Fish & Game; ESOX Angler; American Firearms; Hunter & Sports Education Journal; United Sportsmen Journal; the American Guardian; North American Fisherman; Knight & Hale Ultimate Team Hunting; Ted Nugent's Adventure Outdoors; Shooting; Muskyhunter.com; Motorcycle Riders of America; Plano Shooting, Fish & Game; Fishing Facts; Mossy Oak Hunting; Fish & Hunt; Whitetail Journal's Hunt Club Digest; Cabela's Outfitter Journal; Rifle; Archery Magazine; Midwest Outdoors; Shooting Sports; TNN Outdoors; Whitetales (official publication of the Minnesota Deer Hunters Association); and The National Hunting & Fishing Guide, Dakota Country Magazine. WD-40 does not advertise its WD-40 Specialist Products in any of these publications.

During his deposition, plaintiff testified that he started selling the Inhibitor chips, the toolbox plug, and the Super Plug at Menards in July 2012. Plaintiff said that he was working on getting the oil into Menards but had not done so yet. When asked what section of Menards stores his products were sold in, plaintiff said in tools, storage, and tool boxes. When asked why the VCI V80 Oil is called V80, plaintiff said, "V stands for VCI, and 80 is twice as good as WD-40."

WD-40 has sold its well-known multi-purpose lubricant, penetrating oil, and water-displacing spray for over 50 years. The multi-purpose product carries a famous trademark consisting of a yellow shield bearing the name "WD-40" in blue characters ("the WD-40 shield").[3] According to the record, four out of five adult American consumers have used WD-40 products. In September 2011, WD-40 came out with a sub-brand called the WD-40 Specialist product line. WD-40 owns multiple trademark registrations for this product line and each WD-40 Specialist product bears the WD-40 shield, the trademarked sub-brand name "Specialist," and WD-40's crosshair design trademark which was registered on the principle register on September 4, 2012 (U.S. Trademark Registration No. 4,203,718). The eight WD-40 Specialist products pictured below are: Rust Release Penetrant Spray, Protective White Lithium Grease, Long-Term Corrosion Inhibitor, Machine & Engine Degreaser, Dirt & Dust Resistant Dry Lube, Water Resistant Silicone Lubricant, Electrical Contact Cleaner Spray, and Rust Remover Soak.



The WD-40 Specialist Long-Term Corrosion Inhibitor contains VCI and its function is to inhibit rust for a long period of time. In marketing the WD-40 Specialist products, WD-40 concentrates on tradesmen; industrial consumers; auto consumers; construction-type people; and maintenance, repair, and operations consumers, with the greatest emphasis on the auto industry through a marketing partnership with celebrity automotive designer and fabricator Chip Foose. WD-40 Specialist products are also promoted in numerous print and online media concentrating on automobile enthusiasts, tools, and equipment.[4] WD-40 does not specifically market to hunting and fishing

---

[3]WD-40 has provided the expert report of Philip Johnson of Leo J. Shapiro and Associates, Inc., in which he concludes based on survey data that WD-40 is a famous brand among the overall adult population in the United States. This evidence is not refuted and, in any event, plaintiff does not disagree that WD-40 is a famous brand.

[4]The parties agree that these include Motor Magazine, Professional Tools & Equipment, Hotrod Restoration, Automotive Body Repair News, Motor, Construction Distribution, Equipment World, Utility Contractor, Contractor Supply, Equipment Today, Road and Track, Street Rodder, 4Wheel & Off Road, Industrial Supply, New Equipment Digest, Gear Solutions, and Industrial Equipment News.

consumers in marketing WD-40 Specialist products.

Graham Milner was the WD-40 Executive Vice President for Global Innovation who led a group called Team Tomorrow which was primarily responsible for the Brand Extension Exploration Project ("BEEP") that led to the creation of the WD-40 Specialist line of products. At his deposition, Milner denied that WD-40 ever actually considered a partnership with plaintiff. Milner acknowledged a document styled "Ten Concepts for WD-40" (Ex. 68 of WD-40's Appendix of Evidence, Doc. 78, attach. #6, pgs. A2616-A2620) which provides, as the first concept, the following:

### 1. Vapor-phase Corrosion Inhibition (VCI) with WD-40® Multipurpose Lubricant

Overview: WD-40 stops rust even better with powerful VCI technology, with rust inhibitors that move through the air to reach into places that spray alone would miss.

Product forms: Spray cans. Can also work with drip spouts and many other delivery means.

Partnerships: For rapid market entry, WD-40 could consider partnership with VCI providers such as Northern [T]echnologies International, Daubert-Cromwell, Cortec, Amcor Protective Packaging and Van Patten Industries.

Distribution: Home improvement centers, mass merchandisers, hardware and paint stores, etc., using distributors and sales representative organizations.

Milner explained that in this document, an outside consulting group, Innovation Edge, identified five providers of VCI technology. According to Milner, his team became aware of Van Patten Industries as a potential technology provider at the time his team received the "Ten Concepts for WD-40" document from Innovation Edge, which was in 2009 or 2010. Prior to that document, WD-40 had no knowledge of Van Patten Industries or plaintiff. Milner testified that he was aware of Van Patten Industries as a source of VCI technologies before the decision to use Long-Term Corrosion Inhibitor as the functional description of WD-40 Specialist Long-Term Corrosion Inhibitor, but denied any knowledge of Van Patten Industries use of a crosshair design mark.

Milner testified further that the descriptors "corrosion-preventing spray," "advanced corrosion preventer," and "rust-preventing spray" were all considered for the product that ultimately became WD-40 Specialist Long-Term Corrosion Inhibitor. Milner explained that the descriptor "Long-Term Corrosion Inhibitor" was the result of findings by an outside research agency and was chosen by WD-40's marketing department. ECHO Brand Design ("ECHO") in London, one of three firms hired to create the design for the WD-40 Specialist products' labels, conceived of the crosshair design ultimately used on the WD-40 Specialist products. Once it was learned that the crosshair design was well-received, internal legal experts consulted with external legal experts to ensure that the WD-40 shield would not be compromised and to ensure that they were not infringing on anyone else's design. According to Milner, in marketing WD-40 Specialist products, WD-40 focuses on mechanics and other professional users but not the hunting or fishing industry. Milner acknowledged that the WD-40 Specialist U.S. Communications Guide requires the use of the entire name "WD-40 Long-Term Corrosion Inhibitor" in advertising and marketing communications.

Maria Mitchell is WD-40's Corporate Secretary and Vice President of Corporate Investor

Relations.  During her deposition, Mitchell testified that she never heard of plaintiff, Van Patten Industries, or "the inhibitor" products until WD-40 was served with the instant lawsuit.  Mitchell identified a 10-page document generated by Innovation Edge entitled "Executive Summary," (Ex. 63 of WD-40's Appendix of Evidence, Doc. 78, attch. #3, p. A2534) which she was told WD-40 produced in discovery.  The last sentence of the first paragraph of that document reads: "The resulting product may have some characteristics related to, for example, Remington's Rem® Oil with MoisterGuard$^{TM}$ Rust Preventative, a hydro-carbon based product for gun maintenance comprising Teflon® particles and Inhibitor® VCI technology from Van Patten Industries." Mitchell agreed that the document indicates that WD-40 had knowledge of Van Patten Industries and the Inhibitor line of products but did not know when WD-40 came into possession of the document.

Innovation Edge founder Cheryl Perkins testified that WD-40 was interested in extending the brand into new spaces and asked her firm to explore opportunities that could build off the WD-40 multi-purpose product.  Perkins said that the Executive Summary was prepared by members of the Innovation Edge team working with outside contractors after a Team Tomorrow member at WD-40 engaged her firm in 2007 to evaluate their ideas.  The main author was Innovation Edge employee Jeff Lindsay.  Perkins e-mailed the executive summary to Graham Milner on September 28, 2009.  Perkins identified an Innovation Edge power point document entitled "Brand Extension Exploration Project (BEEP) 2 October 2009" (Ex. 64 of WD-40's Appendix of Evidence, Doc. 78, attchs. #3-4, pgs. A2545-2570) which was sent to WD-40 employees including Milner.  The slide with the bullet point "Prospective partners for VCI technology" provides: "–Cortec and Northern Technologies Intl.  Both have IP that could provide a competitive advantage.  –Daubert-Cromwell, Armor, Van Patten, others could be considered."  Perkins explained that the concept was to add VCI technology to the WD-40 multi-purpose product and, based on their IP estates, Cortec and Northern Technologies were the best candidates to provide that technology.  Perkins said they did not review any of the companies' products in preparation of the slide.

A document styled "Conceptual Ideas Presented by Innovationedge, LLC" (Ex. 65 of WD-40's Appendix of Evidence, Doc. 78, attch. ##5-6, pgs. A2572-2592) was created in early 2010 and sent to various individuals at WD-40 including Milner.  The first concept was "Vapor-Phase Corrosion Inhibition (VCI) Product" and includes the language "Partnerships: For rapid market entry, WD-40 could consider partnership with VCI providers such as Northern Technologies International, Daubert-Cromwell, Cortec, Amcor Protective Packaging and Van Patten Industries." Perkins stated that this stage of the project did not include specific product evaluation or a product packaging design evaluation and that no products sold by these companies were displayed for or sent to WD-40.  Perkins also identified "WD-40 Brand Extension Exploration Project Business Case –Corrosion Products" ("Corrosion Products Case Study") (Ex. 66 of WD-40's Appendix of Evidence, Doc. 78, attch. #6, p. A2594-A2611) as a document created by Innovation Edge and sent to WD-40 which provides in pertinent part:

> An area of particular promise is vapor-phase corrosion inhibitors (VCI technology) which could be incorporated into a WD-40 product.  Technology can be provided from several prospective partners such as Northern Technologies International (NTI, makers of the Zerust® brand), Cortec Company, Daubert-Cromwell, Armor Protective Packaging, and Van Patten Industries, but we suggest consideration of NTI

and Cortec for the potential competitive advantages offered by their intellectual property and possibly Daubert-Cromwell for their diversity of product formats and trade secrets.

(Id. at p. A2597.)  Perkins testified that neither the products nor the product packaging of the companies mentioned in this document were considered when preparing the document and the companies' products were not sent to WD-40.

Perkins testified further that on June 2 & 3, 2010, WD-40 hosted a technical exchange to bring the leading formula candidates in for review by the WD-40 team in order to determine which one to proceed with to the product development stage.  Cortec, Daubert-Cromwell, Fluid Environmental, Enviro-Safe Services, and Northern Technologies were invited to the exchange. Perkins said that prior to this litigation she had only heard of Van Patten Industries as having VCI technology, but had never heard of plaintiff or Inhibitor Technology Corporation and was not familiar with any intellectual property held by plaintiff or any of the products listed for sale on theinhibitor.com website.  Perkins stated that Innovation Edge did not incorporate any of those products into any presentation or documents provided to WD-40.  Perkins agreed that the Corrosion Products Case Study referred to theinhibitor.com website, but indicated that she did not access the website in reviewing that document.  However, Perkins agreed that someone at Innovation Edge reviewed the website prior to preparation of the document.  Innovation Edge did not participate in the design of the packaging or labels for the WD-40 Specialist product line and did not suggest that WD-40 use the word inhibitor or the crosshair design.

Nicholas Dormon, the managing director and co-owner of ECHO, the United Kingdom-based design agency hired by WD-40 in 2009 to create and develop the design for the WD-40 Specialist product line, provided a declaration in which he swears that plaintiff's brands and products were not brought to ECHO's attention at any time before or during the development of the WD-40 crosshair design.  Dormon swears further that ECHO had never heard of plaintiff, Van Patten Industries, Inhibitor Technology Corporation, the Inhibitor products, or the Inhibitor crosshair design mark before the instant litigation was filed.

WD-40 Senior Vice President of North American Sales, Peter Andrew Dumiak, testified that prior to this litigation he was not aware of plaintiff, Inhibitor Technology Corporation, the Inhibitor line of products, or its trademarks.  According to Dumiak, WD-40 products are sold in various channels including "big box" such as Home Depot, Loew's, and Menards; "mass" such as Walmart, Target, and K-Mart; "club" such as Costco, Sams, and BJ's; "automotive" such as Autozone, O'Reillys, Pep Boys, Advanced Auto; "hardware co-ops" including Ace and True Value; and "industrial" including through distributors Fastenal and Grainger.  WD-40 also sells to government agencies such as Armed Forces Information Services ("AFIS") and the Defense Commissary Agency ("DeCA") who provide the products through military commissaries.  Dumiak testified that WD-40 does not sell directly to Bass Pro Shop or Cabela's, but agreed that there could be WD-40 products in those stores if a distributor provided it to the stores.  WD-40's gross sales of WD-40 Specialist Products in the United States in fiscal year 2012 was just over $4 million, and $8.4 million in fiscal 2013.

Brandy Lamb, WD-40's brand manager for the WD-40 Specialist product line, testified that 3-In-One drip oil has been around since the 1890s and WD-40 acquired it in the late 1990s to sell as a stand-alone product. "3-In-One No Rust Shield," which provided a protective barrier to prevent rust from forming on metal, came out in September 2009. The product was marketed by targeting hunters and fishermen, was advertised in hunting and fishing magazines, and was promoted at the Shooting, Hunting, Outdoor Trade Show ("SHOT show") in 2010. 3-In-One No Rust Shield was discontinued because it failed to achieve sales expectations with the last sales occurring in June 2011. WD-40 does not target hunting and fishing consumers in marketing the WD-40 Specialist products. Lamb testified further that he had never heard of plaintiff or his products until this case was filed.

Eric Vander Weit testified that he worked for plaintiff, doing everything from sales to distribution to marketing, for approximately five years ending in 2001 or 2002. However, Vander Weit has maintained a personal relationship with plaintiff. On July 25, 2012, plaintiff called Vander Weit and said "[y]ou need to go find a product by WD-40 called Specialist, and try to find it." Plaintiff said, "[g]o to the hardware store and look for it and tell me what you think." Vander Weit saw several WD-40 Specialist products in the automotive section of a Menards store. When asked if he thought the products were made by plaintiff when he saw them for the first time, he said that when he saw the crosshairs on the products he thought that plaintiff "was doing co-branding with WD-40." Vander Weit agreed, however, that the products' brand was clearly WD-40.

In Count I, plaintiff alleges trademark infringement, 15 U.S.C. § 1114, in that WD-40's use of the word "inhibitor," which is nearly identical to plaintiff's federally protected mark THE INHIBITOR, on closely related or overlapping rust prevention products and targeting the same customers in similar channels of trade is likely to cause confusion, mistake, or to deceive customers into believing that WD-40's goods are plaintiff's goods or are somehow affiliated with plaintiff's goods. In Count II, plaintiff alleges false designation of origin, 15 U.S.C. § 1125(a), in that WD-40's use of the crosshair design mark, standing alone, or in combination with the word "inhibitor" in connection with closely related rust prevention products, infringes on plaintiff's rights in THE INHIBITOR marks and is likely to cause confusion that WD-40's products are plaintiff's products or are affiliated, connected to, or associated with plaintiff's products. In Counts III and IV, plaintiff alleges trademark infringement and unfair competition in violation of Illinois common law, and violation of the Illinois Uniform Deceptive Trade Practices Act, respectively.

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Hemsworth v. Quotesmith.Com, Inc., 476 F.3d 487, 489-90 (7th Cir. 2007). The district judge's function in a summary judgment motion "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. Smith v. Hope Sch., 560 F.3d 694, 699 (7th Cir. 2009).

To prevail on his Lanham Act claims in Counts I and II, plaintiff must establish that (1) his marks are protectable, and (2) the defendant's use of the marks is likely to cause confusion among consumers." Packman v. Chi. Tribune Co., 267 F.3d 628, 638 (7th Cir. 2001). WD-40 argues that it is entitled to summary judgment on plaintiff's Lanham Act claims because (1) plaintiff's marks are not protectable, (2) its use of the word "inhibitor" constitutes fair use and does not infringe on plaintiff's registered word mark THE INHIBITOR, and (3) there is no likelihood of confusion. Because WD-40's second and third arguments are dispositive, the court will not address its first. See id. at 639 (declining to rule on validity of mark where fair use defense and likelihood of confusion analysis entirely disposed of plaintiff's claims).

## A. Fair Use

With regard to Count I, WD-40 contends that its use of the word "inhibitor" to describe what the WD-40 Specialist Long-Term Corrosion Inhibitor does is a good-faith, non-trademark, fair use of the word. Fair use is an affirmative defense, "based on the principle that no one should be able to appropriate descriptive language through trademark registration." Id. (quotation marks omitted). To prevail on its fair use defense, WD-40 must show: (1) its non-trademark use of the word "inhibitor;" (2) that the word "inhibitor" is descriptive of its product; and (3) that it uses the phrase "fairly and in good faith" only to describe its product. Id.; see also 15 U.S.C. § 1115(b)(4).

### 1. Non-Trademark Use

A word or phrase functions as a trademark when a person uses it to identify itself to the public as the source of its product and to create public awareness of the uniqueness of the source and its product. Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 953 (7th Cir. 1992). The record in this case does not support plaintiff's position that WD-40 used the word "inhibitor" on the label of its WD-40 Specialist Long-Term Corrosion Inhibitor to identify plaintiff as the source of the product. Significantly, WD-40's prominent display of its famous WD-40 shield at the top of the can of WD-40 Specialist Long-Term Corrosion Inhibitor demonstrates WD-40's intent to promote itself as the product's source. See Packman, 267 F.3d at 644 (finding that prominent display of alleged infringer's name on product demonstrates alleged infringer's intent to promote itself as the product's source). If WD-40 were using the word "inhibitor" in a trademark sense for the purpose of alerting consumers that plaintiff was the source of the product, then putting the WD-40 shield on the can would work at a cross-purpose. It is also important to note that WD-40 has not used plaintiff's complete word mark THE INHIBITOR, but rather just the word "inhibitor" in the description of its product and this is further indication of non-trademark use. The parties agree that other manufacturers of competing products have also used the word inhibitor to describe their VCI products. This too is evidence of a non-trademark use. See 2 McCarthy on Trademarks and Unfair Competition § 11:20 (4th ed.) (noting that the use of a term by other sellers of similar goods is an indicia of the descriptiveness of the term). Further indicia of a non-trademark use is that while WD-40 has an extensive line of WD-40 Specialist products, it has only used the word "inhibitor" on the front of the label of the WD-40 Specialist Long-Term Corrosion Inhibitor. Yet another indicia of descriptive use is that the words inhibitor, inhibitors, or inhibit appear in other language on the back of the label.

Plaintiff makes two arguments in his effort to identify evidence in the record to rebut WD-40's evidence that it uses the word "inhibitor" in a non-trademark manner. First, he argues that WD-40's own WD-40 Specialist U.S. Communications Guide requires that the product be advertised only as "WD-40 Specialist Long-Term Corrosion Inhibitor" and, according to plaintiff, this at a minimum creates an issue of fact as to whether WD-40 uses the word "inhibitor" in a trademark sense. The court disagrees. In fact, the opposite is true. WD-40's insistence that the product be referenced exclusively by the phrase "WD-40 Specialist Long-Term Corrosion Inhibitor," rather than by the words "inhibitor" or "the inhibitor," is evidence that WD-40 is using the word "inhibitor" descriptively, not as a trademark.

Second, plaintiff argues that the evidence shows that WD-40 initially named the product "Rust Preventing Spray" and "Corrosion Preventing Spray" before its marketing department modified the name to "Long-Term Corrosion Inhibitor" only after it became aware of plaintiff's THE INHIBITOR word mark. This argument misconstrues the facts and the law. Although it is clear from the record that many descriptors were considered during development, there is no evidence that WD-40 ever selected a name for the product other than WD-40 Specialist Long-Term Corrosion Inhibitor. That some WD-40 employees may have had knowledge of plaintiff's word mark through documents provided by Innovation Edge prior to selecting the name is not sufficient to create an issue of material fact as to fair use because the fair use defense specifically contemplates use of the mark. See Packman, 267 F.3d at 639; 15 U.S.C. § 1115(b)(4). In any event, there is insufficient evidence in this record that the marketing department of WD-40, the entity which selected the name, had any awareness of plaintiff's word mark before selecting the descriptive name "Long-Term Corrosion Inhibitor."

Plaintiff also highlights WD-40's use of the word "inhibitor" in capital letters, on its own line, directly above an orange crosshair similar to his own. This configuration does not suggest use of the word "inhibitor" in a trademark sense. First, it is readily apparent from the sample products submitted by the parties that the crosshair background color utilized on the WD-40 Specialist Long-Term Corrosion Inhibitor is actually light brown and is very different than the blaze orange crosshair background color used by plaintiff. The lettering, size, and placement of the word "inhibitor" on the WD-40 Specialist Long-Term Corrosion Inhibitor also suggests a non-trademark use. The prominent trademark on the can is the WD-40 shield just above the sub-brand name "Specialist" which is in red capital letters. Underneath those marks is the descriptive phrase "Long-Term Corrosion Inhibitor" in capital letters and in white font. The word "corrosion" within this phrase is emphasized by placing it in larger font than the rest of the words in that phrase. In fact, next to the characters "WD-40" on the WD-40 shield, the next largest word on the can is "corrosion," not "inhibitor" and after that "Specialist" not only in larger letters that "inhibitor" but also in a different color. WD-40's emphasis of the terms "WD-40," "corrosion," and "specialist" as opposed to the word "inhibitor" is evidence that it is using the word "inhibitor" descriptively, and not evidence that it is using the word in a trademark sense. For these reasons, plaintiff has failed to demonstrate a genuine issue of material fact as to whether WD-40 used the word "inhibitor" in a trademark sense.

## 2. Descriptive of the Product

A descriptive term ordinarily names a characteristic of a product or service. H-D Mich., Inc. v. Top Quality Serv., Inc., 496 F.3d 755, 759 (7th Cir. 2007). The dictionary definition of a word

9

can be useful in evaluating descriptiveness. See M.B.H. Enters., Inc. v. WOKY, Inc., 633 F.2d 50, 55 n.6 (7th Cir. 1980). The word "inhibitor" means "an agent that slows or interferes with a chemical action." Merriam–Webster.Com, http://www.merriam-webster.com/dictionary/inhibitor (last visited Sept. 9, 2014). There can be no dispute that the word "inhibitor" describes a characteristic of a product the purpose of which is to inhibit rust for a long period of time and which contains the chemical VCI, that is, volatile corrosion inhibitor. It is also important to once again recognize that WD-40 does not use plaintiff's complete word mark THE INHIBITOR on the label of its WD-40 Long-Term Corrosion Inhibitor, instead it has used the component word "inhibitor" to describe the function of the product. Additionally, plaintiff himself agreed that other sellers of products containing VCI use the term "inhibitor" on their labels. See 2 McCarthy on Trademarks and Unfair Competition § 11:20 (4th ed.) (noting that the use of a term by other sellers of similar goods is an indicia of the descriptiveness of the term).

Plaintiff argues that there is an issue of fact as to whether WD-40's use of the word inhibitor was descriptive of their product because the record shows that WD-40 decided not to use the non-infringing names "Rust-Preventing Spray" or "Corrosion-Preventing Spray," and because it utilized the word "inhibitor" on its own line in capital letters directly above the orange crosshair like the one he has been using in connection with his products since 1997. As noted above, there is no evidence that WD-40 ever selected a name for the product other than WD-40 Specialist Long-Term Corrosion Inhibitor and there is insufficient evidence that the marketing department of WD-40 had any awareness of plaintiff's word mark before selecting that name. Also, as explained above, the lettering, size, and placement of the word "inhibitor" on the WD-40 Specialist Long-Term Corrosion Inhibitor suggests a non-trademark descriptive use due to the prominence of the WD-40 shield, the de-emphasized use of the word "inhibitor," and the fact that the crosshair on the WD-40 Specialist Long-Term Corrosion Inhibitor is not similar in color to plaintiff's crosshair design mark. Accordingly, plaintiff has failed to identify evidence that WD-40 has used the word "inhibitor" in "Long-Term Corrosion Inhibitor" non-descriptively.

### 3. Good Faith

There is also insufficient evidence that WD-40 used the word "inhibitor" in connection with its WD-40 Specialist Long-Term Corrosion Inhibitor in bad faith. On this element, plaintiff relies on the Innovation Edge documents prepared for WD-40 which list Van Patten Industries among potential VCI technology providers. Plaintiff specifically identifies the Corrosion Products Case Study which mentions Van Patten Industries and "The Inhibitor® Premium VCI Technology." Plaintiff contends that these documents establish WD-40's knowledge of THE INHIBITOR word mark before it used the word "inhibitor" in its WD-40 Specialist Long-Term Corrosion Inhibitor. WD-40 has contended, however, that there is no evidence that its marketing department, the internal entity that decided upon the name "WD-40 Specialist Long-Term Corrosion Inhibitor," was ever provided with these documents or ever became aware of plaintiff's word mark, and plaintiff has failed to refute that contention.

Even if it is assumed that WD-40 as a whole had knowledge of plaintiff's THE INHIBITOR word mark before naming the product, mere knowledge of plaintiff's word mark and its use of a portion of that mark to describe one of its WD-40 Specialist products cannot by itself be sufficient evidence of bad faith. See Packman, 267 F.3d at 642 (holding that mere knowledge of the plaintiff's

10

trademark is insufficient to establish that the defendant acted in bad faith). If it were, fair use would never be viable because the defense specifically contemplates use of a competitor's trademark, but in a non-trademark sense. Without sufficient evidence of bad faith, the court cannot conclude that there is a genuine issue of material fact as to the third element of the fair use defense. Thus, the only conclusion supported by the record is that WD-40 employed the word "inhibitor" on its WD-40 Specialist Long-Term Corrosion Inhibitor in a non-trademark sense, in good faith, to describe a characteristic of its product. Accordingly, the fair use defense protects WD-40 from liability for trademark infringement or unfair competition based on its use of the word "inhibitor." Consequently, WD-40 is entitled to summary judgment on Count I.

### B. Likelihood of Confusion

With regard to Counts I and II, WD-40 argues that plaintiff has not presented sufficient evidence to demonstrate a genuine issue of material fact as to a likelihood of confusion. "To decide whether there is a likelihood of confusion between . . . products, a court must ask whether consumers, and specifically consumers who would use either product, would be likely to attribute them to a single source." Bd. of Regents of Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc., 653 F.3d 448, 455 (7th Cir. 2011). "Likelihood of confusion is synonymous with 'probable' confusion–it is not sufficient if confusion is merely 'possible.'" 4 McCarthy on Trademarks and Unfair Competition § 23:3 (4th ed.). This is because "[m]any consumers are ignorant or inattentive, so some are bound to misunderstand no matter how careful a producer is." August Storck K.G. v. Nabisco, Inc., 59 F.3d 616, 618 (7th Cir. 1995).

The Seventh Circuit has identified the following seven factors as important in determining the likelihood of confusion:

> (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of plaintiff's mark; (6) any actual confusion; and (7) the intent of defendant to 'palm off' his product as that of another.

Bd. of Regents, 653 F.3d at 454. "No single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented." CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 678 (7th Cir. 2001). Therefore, the court may conclude that there is no genuine issue of material fact as to the likelihood of confusion element even if there is a genuine issue of material fact as to one or more of the seven factors. AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 616 (7th Cir. 1993) (rejecting argument that order granting summary judgment must be reversed unless moving party "established that there were no material issues of fact on any of the seven elements of the 'likelihood of confusion' test"). This is because the "weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other." Id. (quotation marks omitted). The similarity of the marks, defendant's intent, and actual confusion are "particularly important factors." CAE, Inc., 267 F.3d at 678; see also Ty, Inc. v. Jones Grp., Inc., 237 F.3d 891, 898 (7th Cir. 2001) ("Even though no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important factors

in a likelihood of confusion case." (quotation marks omitted)). The determination of whether consumers are likely to be confused about the origin of products "may be resolved on summary judgment if the evidence is so one-sided that there can be no doubt about how the question should be answered." Packman, 267 F.3d at 637 (quotation marks omitted).

### 1. Similarity Between the Marks in Appearance and Suggestion

"To determine whether two marks are similar, [courts] view the marks as a whole." AutoZone, Inc. v. Strick, 543 F.3d 923, 929 (7th Cir. 2008). "The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail." Id. at 930 (quotation marks omitted). Therefore, "comparison of the labels rather than the trademarks is appropriate." Henri's Food Prods. Co. v. Kraft, Inc., 717 F.2d 352, 355 (7th Cir. 1983). Viewed from that perspective, the marks in this case are not similar enough that a reasonable trier of fact could find that a consumer would believe that the WD-40 Specialist products are plaintiff's products or somehow connected to plaintiff's products.

Looking at the entirety of the labels on the sample products submitted by the parties, one can readily distinguish between those produced by plaintiff and those produced by WD-40. Notably, the WD-40 Specialist products have labels which are black at the top and silver on the bottom and prominently display the famous yellow and blue WD-40 shield over the word SPECIALIST. One simply cannot miss or fail to recognize the WD-40 shield on the WD-40 Specialist products and this makes confusion very unlikely. See Packman, 267 F.3d at 645 (holding that prominent display of a well-known trademark along with the alleged infringing mark is a strong indication that there is no likelihood of confusion). In sharp contrast, plaintiff's products are predominently clad in blaze orange with black lettering and prominently display the inhibitor design mark. See Ziebart Int'l Corp. v. After Market Assocs., Inc., 802 F.2d 220, 227 (7th Cir. 1986) ("Prominent display of different names on the marks . . . reduce[s] the likelihood of confusion even where . . . the marks are otherwise similar."). Plaintiff would have this court compare his trademarks to only that portion of the WD-40 Specialist Long-Term Corrosion Inhibitor label which includes the word "inhibitor" above the crosshair. However, such a practice would violate the "view as a whole" rule. See AutoZone, 543 F.3d at 930.

It is also important to recognize that "[w]hen attempting to determine if two marks are similar, the comparison should be made in light of what happens in the marketplace, and not merely by looking at the two marks side-by-side." Ty, Inc., 237 F.3d at 898 (citation and quotation marks omitted). "The test is not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." AutoZone, Inc., 543 F.3d at 930 (quotation marks omitted). As explained infra, there is scant evidence of plaintiff's products ever being sold in the marketplace side-by-side with the WD-40 Specialist products. Nevertheless, for the following reasons, there is insufficient evidence that a customer is likely to be confused as to the product's source when he or she views the WD-40 Specialist Long Term Corrosion Inhibitor alone or next to plaintiff's products.

The principal similarity on the labels is the WD-40 crosshair and plaintiff's crosshair design. However, many distinctions arise with respect to the crosshairs which avoid any confusion. Plaintiff

uses the crosshair inconsistently. Of the twenty product samples submitted by plaintiff, four utilize an empty crosshair, twelve utilize a crosshair containing images, and four utilize a bull's eye rather than a crosshair. In contrast, WD-40's crosshair is the same, with the exception of the four images within the crosshair identifying example uses for the respective products. The crosshairs with images on the respective products are also distinguishable. The crosshair design on each of plaintiff's products which bears a crosshair with images contains a hunter, fishing rod, golf bag, and crossed saw and hammer, with the exception of the V80 Nano-VCI Oil Blend aerosol can which has a crosshair containing a car, wrench, handgun, and fishing lure. In contrast, the crosshairs on each of the WD-40 Specialist products are unique and all contain different images than the crosshairs on plaintiff's products. For example, the four images within the crosshair on the WD-40 Specialist Long-Term Corrosion Inhibitor are a padlock, propane tank, ball hitch, and snowblower. The respective use of the crosshairs are further distinguished by the background color. As noted above, contrary to plaintiff's contention, no WD-40 Specialist product has a crosshair with an orange background. Instead, the background color of the crosshairs on the WD-40 Specialist products vary in color from red, to light brown, to blue, to green, to gray, but none has the distinctive blaze orange that plaintiff uses as the background for his crosshairs and as the predominant color of the labels on his products.

The other similarity on the labels is the use of the word "inhibitor." All of the WD-40 Specialist products have words in capital letters describing the product just below the word Specialist. Only the WD-40 Specialist Long-Term Corrosion Inhibitor uses the word "inhibitor" in that description. As determined above, the record evidence indicates that WD-40 has fairly used the word "inhibitor" because that word is only part of plaintiff's word mark, because the only evidence before the court is that WD-40 uses the word descriptively, and because there is insufficient evidence of bad faith or a trademark use. Instead, there is strong evidence of a non-trademark use of that word due to the prominent use of the WD-40 shield on the product. This same analysis demonstrates that there is insufficient evidence of a likelihood of confusion due to WD-40's use of the word "inhibitor." Additionally, based on the above analysis concluding that there is insufficient evidence of similarity of the respective crosshairs, there is also insufficient evidence of similarity of marks due to the word "inhibitor" appearing just above the WD-40 crosshair. For these reasons, plaintiff has failed to create a genuine factual dispute as to the similarity of the marks factor.

### 2. Similarity of the Products

The relevant inquiry with respect to this factor is not whether the products are interchangeable, but whether the products are the kind the public might very well attribute to a single source. Autozone, Inc., 543 F.3d at 931. "The rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer." Id. "Closely related products are those that would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." CAE, Inc., 267 F.3d at 679 (quotation marks omitted).

The evidence before the court shows that plaintiff sells VCI Plugs, VCI Pro Chips (VCI infused cardboard chips for tool and tackle boxes), V80 Nano-VCI Oil Blend (in both drip bottles and aerosol cans), V80 VCI Oil Wipes, V80 VCI Grease, VCI Cleaner/Degreaser, VCI Covers, Poly Bags, Stretch Film, VCI Paper, and Wiping Cloths. Plaintiff's plugs, chips, cloths, paper, film, poly

13

bags, are not similar products to the WD-40 Specialist products. All of plaintiff's oil products contain VCI while only WD-40 Specialist Long-Term Corrosion Inhibitor has a label indicating that the product contains VCI. All the WD-40 Specialist products with the exception of the WD-40 Specialist Rust Remover Soak are sold in aerosol cans and only plaintiff's Inhibitor V80 Nano-VCI Oil Blend comes in an aerosol can. Accordingly, the evidence shows that the only products that are potentially similar are the WD-40 Specialist Long-Term Corrosion Inhibitor and the Inhibitor V80 Nano-VCI Oil Blend in the aerosol can. Therefore, on the whole, the respective products of the parties are dissimilar and while there is some evidence of similarity of product between the WD-40 Specialist Long-Term Corrosion Inhibitor and the Inhibitor V80 Nano-VCI Oil Blend in the aerosol can, this evidence does not create a material issue of fact when considered in light of other factors indicating that there is no likelihood of confusion.

### 3. Area and Manner of Concurrent Use

When considering the third factor, courts look at "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties." CAE, Inc., 267 F.3d at 681. A court also looks to whether the parties used the same channels of commerce, targeted the same general audience, and/or used similar marketing procedures. Id. at 681-82.

Plaintiff contends that the evidence demonstrates that the parties' distribution channels and target markets overlap because each party sells its products in the automotive section at "big-box" stores such as Menards as well as in small hardware stores. Plaintiff also contends that the evidence shows that each party targets the military, the hunting and fishing market, and industrial markets. While the evidence might show some overlap in the channels of commerce and target consumers, it is very limited and plaintiff's argument overstates that overlap. For example, while it is true that the evidence shows that WD-40 is sold in the automotive section of all the major box stores including Menards, plaintiff specifically testified that only his VCI Pro Chips, the toolbox plug, and the Super Plug are sold at Menards. These three products are dissimilar to any WD-40 Specialist product and are not sold in the automotive section of Menards but, rather, in the tools, toolboxes, and storage section. Significantly, plaintiff has not identified evidence in this record that his aerosol cans of V80 Nano-VCI Oil Blend, the product most similar to the WD-40 Specialist Long-Term Corrosion Inhibitor, is sold at Menards, let alone sold in the same section of the store.

Plaintiff's contention that both parties sell their products in small hardware stores is also scarcely supported. Plaintiff directs the court to the following portion of his own deposition testimony in support of this contention:

Q. Okay. Do you sell Inhibitor Products at drugstores?

A. In drugstores? Well, smaller towns sell chips and have sold oil and stuff because they sell some tackle and it kind of gets put out on the shelves.

Q. So maybe?

A. Yes, you know.

Q. How about farm stores?

> A. I know we have been working in the past with Tractor Supply, and I know that through the Plano side of things, once again, you're in Fleet Farm and Farm & Fleet and some of the tractor supplies. I've sold product through a company called Westphalia who has sold product in to farm implement stores and so forth.

This testimony does not address small hardware stores. However, a portion of plaintiff's deposition testimony appearing two pages earlier actually supports plaintiff's contention better because he indicates that "we have shipped product to some independent Ace-type True Value Hardware Stores" including "a variety of everything from oil to chips." However, plaintiff has not testified, or identified any evidence showing, that the WD-40 Specialist products were also sold in those same stores at the same time or in the same section of the store.[5]

As for plaintiff's contention that WD-40 targets the military, it is supported only by evidence that WD-40 sells products to AFIS and the DeCA who in turn supply military commissaries, but there is no evidence that the military is specifically targeted by WD-40 or that plaintiff's products are also sold in this manner. As for the industrial channel of distribution, while there is evidence that WD-40 sells to industrial customers though distributors like Fastenal and Grainger, there is no evidence that plaintiff's products are sold through such channels. Plaintiff's contention that WD-40 targets the hunting and fishing markets and the public generally is supported only by Dumiak's testimony that WD-40 targets everyone and that of Lamb indicating that WD-40 targeted hunters and fisherman in efforts to sell its 3-In-One product, which is not a WD-40 Specialist Product. Finally, while there is evidence that both parties promote their products on the internet in some fashion, there is no evidence that someone looking to find one or the other parties' products would inadvertently come across a website selling the other.

With respect to use, while the primary purpose of both of these products is to prevent rust from forming on metal surfaces the products are for the most part marketed to distinct groups of users. The evidence shows that, although it is a multi-use product, the primary users of all plaintiff's products, including the Inhibitor V80 Nano-VCI Oil Blend in the aerosol can, are hunters and fishermen. This is demonstrated by the evidence showing that plaintiff's products have been promoted nearly exclusively in hunting and fishing print and online media, at gun and outdoor trade shows, and through sponsorships by professional anglers. In contrast, the evidence shows that the primary users of WD-40 Specialist products, including the WD-40 Specialist Long-Term Corrosion Inhibitor, are auto mechanics, professional users of tools, and those who work on or operate industrial equipment. This is demonstrated by the evidence showing that WD-40 has promoted its WD-40 Specialist product line in numerous automotive, tool, and industrial print and online media as well as through a sponsorship by celebrity automotive designer Chip Foose.

---

[5] Plaintiff testified regarding his partnership with the Plano Molding Company resulting in his VCI Pro Chips being sold along with Plano tackle boxes in a variety of stores including K-Mart, Farm & Fleet, Tractor Supply, and Wal-Mart. In fact, one of the sample products provided to the court was Plano's "Prolatch Inhibitor Stowaway" with Inhibitor VCI chips also referred to as the 3700 tackle box. There is no evidence, however, that this product was ever sold in the same store, let alone in the same section of a store, as the WD-40 Specialist products. More importantly, the Plano tackle box is in no way similar to any WD-40 Specialist product vitiating any likelihood of confusion.

15

Therefore, while there is some very limited evidence of area and manner of concurrent use, it does not warrant any significant weight under the circumstances presented in this case and does not raise a material issue of fact as to the likelihood of confusion when considered in light of all the other likelihood of confusion factors.

### 4. Degree of Care Likely to Be Exercised by Consumers

Generally, "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." CAE, Inc., 267 F.3d at 683. Less sophisticated consumers may also increase the likelihood of confusion, while more sophisticated consumers will decrease it. Rust Env't & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1217 (7th Cir. 1997).

WD-40 does not contend that plaintiff's evidence comes up short on either of these criteria. Instead, WD-40 argues that the prominence of its famous WD-40 shield on the WD-40 Specialist products mitigates against a likelihood of confusion due to the low cost of the products and absence of evidence that consumers of the products are sophisticated. However, this is not an argument that the fourth likelihood of confusion factor is not met in this case as much as it is an argument that the other factors taken together outweigh this minimal evidence of a likelihood of confusion such that it does not create an issue of fact when considered in light of other factors indicating that there is no likelihood of confusion. Nevertheless, despite some evidence supporting this factor, the court ultimately agrees based on the prominence of the WD-40 shield on each WD-40 Specialist Product and other factors that there is insufficient evidence upon which a reasonable trier of fact could conclude that consumer lack of care creates a likelihood of confusion. See AHP Subsidiary Holding, 1 F.3d at 616 (rejecting argument that order granting summary judgment must be reversed unless moving party "established that there were no material issues of fact on any of the seven elements of the 'likelihood of confusion' test"); see also Spraying Sys. Co. v. Delavan, Inc., 975 F.2d 387, 390 (7th Cir. 1992) (upholding summary judgment for defendant in trademark infringement case where defendant conceded goods were similar and shared with plaintiff essentially the same channels of trade and consumers).

### 5. Strength of Plaintiff's Mark

"The strength of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." CAE, Inc., 267 F.3d at 684 (quotation marks omitted). "The stronger the mark, the more likely it is that encroachment on it will produce confusion." Autozone, 543 F.3d at 933 (quotation marks omitted). A mark's strength ordinarily corresponds to its economic and marketing strength. Id.

Plaintiff maintains that the evidence in the record demonstrates that his THE INHIBITOR word mark and crosshair design mark have been displayed in hundreds of stores nationwide and have been the subject of hundreds of thousands of dollars' worth of television and other advertising. However, as pointed out by WD-40, plaintiff's word mark is descriptive of the product and he has not identified evidence indicating that it has acquired any secondary meaning by providing evidence that the mark has become recognized by consumers in the marketplace. Id. In addition, the strength of plaintiff's crosshair design mark and the inhibitor design mark has been weakened through inconsistent use, most notably the varying utilization of a crosshair with images, a crosshair without

16

images, or just a bullseye. Plaintiff also has not identified evidence indicating that these marks have acquired any secondary meaning. For these reasons, a trier of fact could not reasonably conclude that plaintiff's marks have sufficient economic and marketing strength to satisfy this factor.

### 6. Actual Confusion

Plaintiff acknowledges that he has not adduced significant evidence of actual confusion. In fact, there is insufficient evidence in the record that any consumer of WD-40 Specialist products was ever confused about the source of the products or thought that they were plaintiff's products. There is no evidence that any consumer has ever inquired, orally or in writing, whether WD-40 Specialist products are in anyway connected to plaintiff's products. Nor did plaintiff conduct any survey in an effort to determine the likelihood of confusion. Instead, plaintiff maintains that Eric Vander Weit testified that he believed the products might be "co-branded" with one another.

Vander Weit testified that he believed WD-40 was the brand of the WD-40 Specialist Long-Term Corrosion Inhibitor. Plaintiff has not identified, nor has this court located on its own, any authority establishing that a belief that a product is co-branded, that is it has two sources, constitutes evidence of actual confusion as to the source of the product.[6] Nevertheless, WD-40 maintains that this testimony does not constitute evidence of actual confusion because Vander Weit was not an actual consumer but, rather, was sent by plaintiff to find the WD-40 Specialist products. The court agrees that Vander Weit was not an actual consumer relevant to the likelihood of confusion analysis. See Packman, 267 F.3d at 645 (holding that the individuals plaintiff advanced as actually confused were not relevant "consumers" under the Lanham Act because plaintiff did not show that they purchased or attempted to purchase the goods in question).

In any event, the court also agrees with WD-40 that even assuming for the sake of argument that Vander Weit was a relevant consumer and that his deposition testimony constituted evidence of actual confusion, his testimony alone is insufficient to create a genuine issue of material fact. See id. (affirming district court's conclusion that confusion on the part of four relevant consumers was de minimis evidence of confusion); Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 173 (7th Cir. 1996) ("[W]e think it wholly unlikely that any significant number of consumers would be misled. And that is the test, so that the plaintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion." (citation omitted)); Sunmark, Inc. v. Ocean Spray Cranberries, Inc., 64 F.3d 1055, 1060 (7th Cir. 1995) (holding that evidence that three consumers were confused did not demonstrate likelihood of confusion). For these reasons, a trier of fact could not reasonably conclude

---

[6] Plaintiff mentions the concept of reverse confusion not with respect to the actual confusion factor but, rather, in passing with respect to the degree of care exercised by consumers factor. WD-40 maintains that plaintiff has not plead reverse confusion in his complaint and any attempt to argue that theory now should be dismissed out-of-hand. The court agrees but also notes that due to the lack of evidence of a likelihood of confusion discussed infra, there is also insufficient evidence of a likelihood that a consumer of the WD-40 Specialist products would be confused into thinking that plaintiff's products emanate from, are connected to, or are sponsored by WD-40. See Fortres Grand Corp. v. Warner Bros. Entm't Inc., ___ F.3d ___, No. 13-2337, 2014 WL 3953972, at *3 (7th Cir. Aug. 14, 2014) (discussing reverse confusion).

that there has been actual confusion by consumers that the WD-40 Specialist products were produced by plaintiff.

### 7. Intent of Defendant to 'Palm Off' His Product as that of Another

This important factor focuses on any evidence that the defendant is attempting to pass off its products as having come from the plaintiff. Packman, 267 F.3d at 644. Once again, WD-40's prominent display of its famous WD-40 shield on each of the WD-40 Specialist products demonstrates WD-40's intent to promote itself, and not plaintiff, as the products' source. See id. Plaintiff's theory as to this factor is that WD-40 contemplated other names for its WD-40 Specialist Long-Term Corrosion Inhibitor and instead of selecting one of those names, WD-40's marketing department chose "Long-Term Corrosion Inhibitor" only after it learned of plaintiff's registered word mark. As the court has previously mentioned, there is evidence that WD-40 employees may have been made aware of Van Patten Industries as a VCI provider and that Van Patten Industries was using THE INHIBITOR word mark. This evidence is in the form of the Innovation Edge documents prepared for Team Tomorrow. For example, the Corrosion Products Case Study refers to "Inhibitor® VCI technology from Van Patten Industries." There is, however, insufficient evidence that anyone in the WD-40 marketing department, the component of WD-40 which decided on the name "WD-40 Specialist Long-Term Corrosion Inhibitor," was privy to this information. In any event, mere knowledge of plaintiff's mark is insufficient to show an intent to pass off. Id. Moreover, as determined above, WD-40's use of the word "inhibitor" was a fair use and therefore contrary to a finding of bad faith.

As for plaintiff's crosshair design mark and the inhibitor design mark, the court agrees with WD-40 that there is insufficient evidence of its knowledge of these marks prior to this litigation. Notably, the unrebutted evidence demonstrates that Innovation Edge did not provide WD-40 with product samples of the contemplated VCI providers' products or photographs of those products. Significantly, Dormon's declaration that ECHO designed the WD-40 crosshair without any knowledge of plaintiff's crosshair design mark or the inhibitor design mark stands unrefuted. Plaintiff invites the court to infer, based on the Innovation Edge documents, that Innovation Edge advised WD-40 of plaintiff's products and that WD-40 in turn advised ECHO of his design marks. This is not a reasonable inference because the Innovation Edge documents contain no reference to or information about plaintiff's crosshair design mark or the inhibitor design mark. Instead, the documents only list potential VCI providers without any reference to their specific products, do not provide photos or descriptions of those products, and, other than his own conclusory assertion, plaintiff provides no reason why such inferences could be drawn.[7] Consequently, plaintiff has failed to identify sufficient evidence to create a genuine issue of fact as to WD-40's intent to pass off its WD-40 Specialist products as plaintiff's products.

Based on the foregoing analysis, the court concludes that there is no genuine issue of material fact as to the three most significant likelihood of confusion factors. Specifically, plaintiff has failed to identify any evidence of actual confusion, see Nike, Inc. v. Just Did It Enters., 6 F.3d 1225, 1231

---

[7]Ironically, there is evidence that plaintiff may have had an intent to palm off on WD-40's trademark in the form of his testimony that the V in V80 "stands for VCI, and 80 is twice as good as WD-40."

(7th Cir. 1993) (noting that in resolving a summary judgment motion "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." (quotation marks omitted)), failed to create a genuine factual dispute as to the similarity of the trademarks, and has not advanced sufficient evidence of any intent on WD-40's part to pass off its WD-40 Specialist products as having come from plaintiff.  In addition, plaintiff has not identified evidence upon which a jury could conclude that his trademarks are strong.  There is some evidence of a similarity of the products, slight evidence of area and manner of concurrent use, and evidence of a low degree of care likely to be exercised by consumers.  However, the existence of a genuine issue of material fact as to one or more likelihood of confusion factor does not preclude summary judgment where in totality the evidence is one-sided.  See AHP Subsidiary Holding, 1 F.3d at 616.  This is such a case because, based on the evidence before the court, no reasonable trier of fact could conclude that there is a likelihood of confusion.  Thus, WD-40 is entitled to summary judgment on Counts I and II.

Plaintiff's remaining claims are for trademark infringement and unfair competition under Illinois common law and for violation of the Illinois Uniform Deceptive Trade Practices Act.  A necessary element of all these claims is that there be a likelihood of confusion.  AutoZone, 543 F.3d at 929.  The state unfair competition claim is analyzed under the likelihood of confusion standard and thus mirrors Lanham Act infringement analysis.  McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1174 (7th Cir. 1986) ("Likelihood of confusion has the same meaning in unfair competition cases under the Deceptive Trade Practices Act as it has in traditional infringement cases." (quotation marks omitted)); Microsoft Corp. v. Rechanik, 249 F. App'x 476, 479 (7th Cir. 2007) ("[S]tate-law claims of consumer fraud, deceptive trade practices, and unfair competition based on trademark infringement are analyzed using the same standards as federal trademark claims. So summary judgment on those claims was also appropriate." (citations omitted)).  Having concluded that there is no genuine issue of material fact as to a likelihood of confusion, WD-40 is entitled to summary judgment on Counts III and IV as well.

### III.  CONCLUSION

For the foregoing reasons, WD-40's motion for summary judgment is granted as to all Counts.

Date: 9/9/2014                                          ENTER:

_____
FREDERICK J. KAPALA

District Judge

19